**MAID OF THE MIST CORPORATION and Affiliated Corporations, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**Docket 77–4213.**

United States Court of Appeals, Second Circuit.

Argued Nov. 30, 1978.

Decided March 20, 1979.

John G. Dowd, Niagara Falls, N. Y., for petitioner-appellant.

Gilbert S. Rothenberg, Atty., Tax Div., Dept. of Justice, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Gary R. Allen, Attys., Tax Div., Dept. of Justice, Washington, D. C., of counsel), for respondent-appellee.

Before MOORE, FRIENDLY and GURFEIN, Circuit Judges.

1. The parties to the contract were actually Hike and Maid of the Mist Steamboat Co., Ltd., a Canadian corporation which was taxpayer's wholly-owned subsidiary. For the taxable year

MOORE, Circuit Judge:

## I

Maid of the Mist Corporation ("taxpayer") is a New York corporation with its main office located at Niagara Falls, New York. Its principal business is the operation of excursion boats at the foot of Niagara Falls. Sometime prior to December 16, 1971, taxpayer decided to expand its fleet of excursion boats. On December 16, 1971, James V. Glynn ("Glynn"), taxpayer's president, met in Port Dover, Ontario, with representatives of Hike Metal Products, Ltd. ("Hike"), a Canadian shipbuilding concern which had previously built excursion boats for taxpayer. At this meeting, a contract between Hike and taxpayer[1] for the construction and purchase of an excursion boat was signed. The contract had been drafted by taxpayer's counsel two days before the meeting and was apparently the result of prior negotiations between the parties. The purchase price was $129,737.32.

The contract provided that "Title to and property in the Vessel shall be vested in the Shipowner [i. e., taxpayer] from the signing of this contract." The contract also provided that $3,000 of the purchase price was to be paid to Hike when the contract was signed. However, Glynn did not pay Hike the $3,000 at that time, despite the fact that he had a check for that amount—dated December 16, 1971, and made payable to Hike—in his possession during the December 16 meeting. Instead, Glynn delivered the signed contract to Hike, together with a letter which read as follows:

"We hand you herewith original and duplicate copy of contract for the construction of a vessel, duly executed by the Ship Owner.

This contract is conditionally delivered to you and such delivery shall become final when you are in receipt of the Ship Owner's [i. e., taxpayer's] check payable to your order in the sum of $3,000.00.

1972, taxpayer elected to treat its Canadian subsidiary as a domestic corporation, and a consolidated corporate income tax return was filed for that year.

As you are aware, this contract contemplates the building of a ship which Ship Owner will be able to place in the Niagara River beneath the Falls ·of Niagara by the use of cranes. As of this date, the contract for such delivery has not been executed and it is anticipated that it will be executed within the next few days and, upon the acceptance of that contract, the undersigned will forward to you the above-mentioned check.

In the event that delivery of the contemplated vessel is not possible by crane, then it will be necessary for us to enter into a new contract, which will call for the building of the vessel and the delivery in parts to the Maid of the Mist Landing and its reassemblage at that point before launching. Therefore, the necessity of conditioning this delivery this date."

On December 18, 1971, taxpayer and Modern Crane Rentals, Ltd., signed a contract in Niagara Falls, Ontario for the delivery of the excursion boat by crane to the bottom of the Niagara River Gorge. On that same day Glynn mailed the $3,000 check to Hike from an Ontario, Canada, post office box. Hike received this check on December 21, 1971. The excursion boat was delivered to taxpayer in June, 1972.

In its income tax return for the year 1972, taxpayer claimed a seven percent investment tax credit for the purchase of the Maid .of the Mist III. The Commissioner, however, disallowed the credit on the ground that the excursion boat was acquired pursuant to an "order" placed between August 16, 1971 and December 20, 1971—when the investment tax credit provisions were suspended with respect to for-

eign-manufactured goods pursuant to § 48(a)(7) of the Internal Revenue Code of 1954. In a memorandum opinion, containing findings of fact, Judge Theodore Tannenwald, Jr., of the United States Tax Court, upheld the Commissioner's determination. The decision, entered by Judge Wiles on August 11, 1977, sustained a deficiency in income tax for the year 1972 in the amount of $11,881.61. From that adverse decision, taxpayer brings this appeal. For the reasons set forth below, we affirm.

## II

On August 15, 1971, the President of the United States, in an effort to reduce the country's balance-of-payments deficit and to strengthen its economic position, issued Proclamation 4074, 3 C.F.R. 60 (1971–1975 Compilation), *reprinted in* 85 Stat. 926 (1971). The Proclamation, which became effective the following day, imposed a ten percent import surcharge on foreign-produced goods brought into the United States. In a related move, Congress thereafter enacted § 48(a)(7)[2] of the Internal Revenue Code of 1954 which temporarily limited the investment tax credit (*see* I.R.C. § 38) to items produced in the United States. Section 48(a)(7) denied the investment tax credit to foreign-made goods "acquired pursuant to an order placed on or before the date of termination of Proclamation 4074 . . . .." On December 20, 1971, the President terminated Proclamation 4074. *See* Presidential Proclamation 4098, 3 C.F.R. 94 (1971–1975 Compilation), *reprinted in* 86 Stat. 1591 (1971). Thus, foreign-manufactured goods acquired pursuant to an "order" placed between August 16, 1971, and

---

**2.** All section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in question.

Section 48(a)(7) provides in relevant part: SEC. 48(a)(7). Property completed abroad or predominantly of ̦foreign origin.—

(A) In general.—Property * * * shall not be treated as section 38 property if—
(i) such property was completed outside the United States, or
(ii) less than 50 percent of ţhe basis of such property is attributable to value added within the United States.

\* \* \* \* \* \*

(B) Period of application of paragraph.—Except as provided in subparagraph (D), subparagraph (A) shall apply only with respect to property described in section 50—
(i) the construction, reconstruction, or erection of which by the taxpayer is begun after August 15, 1971, and on or before the date of termination of Proclamation 4074, or
(ii) which is acquired pursuant to an order placed on or before the date of termination of Proclamation 4074 * * *.

December 20, 1971, are ineligible for the investment tax credit.

The sole issue presented by this appeal is whether taxpayer "ordered" the Maid of the Mist III on or before December 20, 1971, or at a time during which the investment tax credit on foreign-produced goods was suspended. The applicable Treasury Regulations describe an "order" as follows:

"An order is any directive, written or oral, to another person reasonably designed to effect the acquisition of property at a later date. An order need not be a binding contract."

Treas.Reg. § 1.48–1(o)(2)(i) (1972).

Taxpayer argues that an "order" does not arise until there has been a sufficient commitment by a purchaser to a supplier to justify the supplier's generation of economic activity as a result of the purchaser's actions. See BNA Tax Management Portfolio 192–2nd, 1971 at A–43–A–44. In taxpayer's view, the contract was not reasonably designed to effect the acquisition of the ship until Hike received the $3,000 down payment. In other words, the only event upon which the shipbuilder would have acted and did act in commencing construction of the vessel was the receipt of the $3,000 check on December 21. The Government responds that it is anomalous that under a regulation providing that "[a]n order need not be a binding contract," a binding contract should not be an order.

If we regard the difference between a "contract" and an "order" in this case as the controlling issue, the case could go either way. The case could be regarded as a contract case in which the specific condition precedent to the liability of the shipbuilder was the actual receipt of the check. See 5 Williston on Contracts §§ 663, 666A (3d ed.

1961); 3A Corbin on Contracts §§ 627, 628 (2d ed. 1960). Alternatively, it could be argued that the receipt of the check was not a true condition precedent and that, in any event, a contract subject to defeasance arose when it was signed. See 5 Williston on Contracts § 665 (3d ed. 1961); 3A Corbin on Contracts §§ 633, 655 (2d ed. 1960).

In light of our view that an "order" differs from a "contract," we need not decide when a binding contract came into existence. Instead, we are convinced that the proper test is the one set forth in the Treasury Regulations. The "generation of economic activity" test espoused by taxpayer is not supported by the statute, Regulations, or legislative history.

In its attempt to limit the investment tax credit to domestically produced property Congress denied the credit to foreign-produced property on which construction began during the suspension period or which was "acquired pursuant to an order" placed during that time. The probable purpose of inserting the provision regarding "orders" in the Treasury Regulations was to protect those taxpayers who had ordered before the suspension of the credit.[3] However, it appears that Congress did not explicitly consider the corollary issue now confronting this Court: the availability of the credit to the taxpayer who planned to acquire property just before the termination of the suspension period, without knowledge that the period would end before he acquired the property. Thus, the general congressional intent underlying the provision must be examined.

The term "order" was designed to convey a concept broader than that of a "contract." As noted above, the applicable Treasury Regulation provides that an order need not be a legally binding commitment nor a for-

---

**3.** The Senate Report states:

[I]n view of the fact that taxpayers who ordered property (or commenced construction of property) after March 31, 1971, in reliance on the Secretary of the Treasury's statements did so without any knowledge that the credit would be limited to domestically produced property, the committee has modified the House bill to provide that the credit is not to be denied to foreign produced property which

the taxpayer establishes was ordered on or before August 15, 1971, when the limitation on the credit was announced. The credit also is not to be denied in the case of property the construction of which was begun prior to August 16, 1971.

S.Rep.No. 92–437, 92d Cong., 1st Sess. 26, U. S. Code Cong. & Admin. News 1971, pp. 1825, 1933.

mal written document. Treas.Reg. § 1.48–1(o)(2)(i) (1972). This Regulation tracks language contained in a House Committee Report accompanying the passage of an earlier act (Act of November 8, 1966, P.L. 89–800, 80 Stat. 1508, § 1) which suspended the investment tax credit for property acquired pursuant to an order placed, or whose construction was begun, between October 10, 1966, and January 1, 1968. The House Report noted:

> "If an order for construction, reconstruction, or erection of property, or an order for property, is placed by the taxpayer during the suspension period, such property is suspension period property even if construction, reconstruction, erection, or acquisition of such property is begun after the end of the suspension period. For these purposes, an order placed with respect to property during the suspension period need not be a binding contract or a formal written document. *Any directive, written or oral, to another person reasonably designed to effect the acquisition of property at a later date, constitutes an order.*

H.Rep.No. 2087, 89th Cong., 2d Sess. 30 (1966–2 Cum.Bull. 916, 917) (emphasis added).

Here, the actions taken by taxpayer prior to December 20, 1971, constituted a "directive . . . reasonably designed to effect the acquisition," Treas.Reg. § 1.48–1(o)(2)(i) (1972), of an excursion boat at a later date, and hence, an "order" within the meaning of § 48(a)(7). The "directive" occurred prior to December 20, 1971, since all of taxpayer's actions were completed by that date. Indeed, after the crane contract was obtained and the check sent to Hike, on December 18, 1971, there was nothing further taxpayer could have done to "effect the acquisition" of an excursion boat.

Moreover, taxpayer's narrow reading of the statute would defeat the purpose of the suspension period. Not only would it enable some taxpayers to obtain the benefit of the investment credit, even though they had committed themselves to the purchase of foreign-made goods while the suspension period remained in effect, but also it would effectively deny the credit to others who had committed themselves to the purchase of such goods *prior* to the effective date of the suspension period whenever the order was not received until after the Proclamation of August 15, 1971 was issued. It is most unlikely that Congress intended any such result. In the instant case, the fortuitous termination of Proclamation 4074 on December 20 should not result in a windfall to taxpayer, who planned to purchase the foreign-made boat knowing the unavailability of the tax credit.

The judgment of the United States Tax Court is accordingly AFFIRMED.